## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| MARK B. CUNNINGHAM,<br><br>PLAINTIFF,<br><br>vs.<br><br>CONCENTRIX SOLUTIONS CORPORATION, formerly known as CONCENTRIX CORPORATION,<br><br><br>DEFENDANT. | CIVIL ACTION<br><br>NO. _____<br><br>JURY TRIAL DEMAND |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR RACE, SEX AND AGE DISCRIMINATION AND RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (TITLE VII), AND THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA), AS AMENDED

Comes now, Mark B. Cunningham, Plaintiff, by and through his counsel of record, and alleges as follows:

### I.  INTRODUCTION

1.      Concentrix Solutions Corporation, Defendant, discriminated against Plaintiff because of his race (White), sex (male) and age (61) in not being selected for Defendant's Global Chief Human Resource Officer (CHRO).  Defendant selected a much younger Black female with far less experience than Plaintiff.  In addition, Defendant's Chief Executive Officer (CEO), the final selecting official for the CHRO position at issue,  also stated that he was not going to select any White males for  the next Senior Executive Team (SET) position, the position to which Plaintiff applied, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 1**

§ 2000e et. seq., (Title VII) and the Age Discrimination in Employment Act of 1964, as amended, (ADEA) 29 U.S.C. § 621 et seq.

2.     Defendant's violation of the ADEA was knowing, willful and in reckless disregard for Plaintiff's rights protected under the ADEA in violation of 29 U.S.C. § 626(b) of the ADEA.

3.     Plaintiff further alleges that he was retaliated against when he complained to his supervisor about his non-selection for the CHRO in violation of the anti-retaliation provision of Title VII, 42 U.S.C. 2000e-3(a) and 29 U.S.C. § 623(d) the ADEA.

4.     Plaintiff seeks "make whole relief" monetary damages including but not limited to lost past and future wages, benefits, bonuses and stock option grants; liquidated and punitive damages, pursuant to Title VII, 42 U.S.C. § 2000e-5(g) and 29 U.S.C.§ 626(b) of the ADEA.

5.     Plaintiff also seeks an injunction against Defendant prohibiting Defendant from further discrimination and prohibiting Defendant from retaliating against any employee who complains of or opposes discrimination or participates as a witness in the investigation of any complaint of discrimination under Title VII, 42 U.S.C. § 2000e(g) and 29 U.S.C. § 626(b) of the ADEA.

## II.  THE PARTIES

6.     Plaintiff Mark B. Cunningham is a 61-year-old White male and resides at 3401 Caleo Court, Plano, Collin County, Texas, 75025.

7.     At all times relevant herein, Plaintiff was an "employee" as defined in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(f) and the Age Discrimination Act of 1967, as amended, 29 U.S.C. § 630(f).

8.     Defendant Concentrix Solutions Corporation (Concentrix) is a U.S. corporation, incorporated under the laws of the State of New York, with its principal place of business in

Fremont, California, and a totally owned subsidiary of Synnex Corporation.  It has approximately 235,000 employees worldwide.  Its principal line of business is business processing outsourcing (BPO), with numerous call centers across the globe servicing clients worldwide. On or about February 12, 2020, Concentrix Corporation formally changed its name to Concentrix Solutions Corporation in its home jurisdiction of New York.  Defendant reflected that name change in Texas by filing its Amendment to Registration on or about March 10, 2020. Concentrix may be served by serving its registered agent C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas, 75201-3136.

9.      At all times relevant herein, Defendant is an employer as defined under Title VII, 42 U.S.C. § 2000e(b) and the ADEA, 29 U.S.C. § 630(b).

## III.  JURISDICTION AND VENUE

10.      Jurisdiction of this matter arises under 28 U.S.C. §1331 with federal questions involving Title VII and the ADEA. An express grant of federal court jurisdiction over these federal claims is found in Title VII at 42 U.S.C. § 2000e-5(f)(3) and the ADEA at 29 U.S.C. § 626.

11.      This Court also has diversity jurisdiction under 28 U.S.C. § 1332 (a) because: (1)Defendant is a foreign corporation doing business in the State of Texas, (2) the discriminatory acts complained of herein occurred while Plaintiff resided at all times in Plano, Collin County, in the State of Texas,  (3) Plaintiff is a Texas resident and (4) the amount in controversy herein exceeds $75,000.

## IV.  FACTUAL BACKGROUND

12.      Plaintiff was hired by Defendant on December 19, 2016 as its Vice President for Human Resources.  In this role, Plaintiff reported to Steve Richie (Richie), Senior Vice President of Legal and Human Resources (HR).

13.     Plaintiff's total compensation at the time of his initial hire included  (1) a base salary of $210,000 annually; (2) 40% incentive bonus based on his annual salary; (3) stock option grants, (4) health benefits contributions paid in part by Defendant; and (5) participation in Defendant's 401K retirement plan, part of which was paid for in contributions from Defendant.

14.     Immediately before being hired by Defendant, Plaintiff had been the Global Chief Human Resources Officer for Alorica Corporation, responsible for all of Alorica's multi-national HR functions around the globe.

15.     At all times relevant hereto, Plaintiff performed the duties and responsibilities of his job well and his  performance ratings were recorded as a  4 out of a 5 scale (5 being the highest); received  annual merit increases and cash bonuses as a result of his excellent performance;  and also was issued and received restricted stock options as a result of his performance,   which was Defendant's way  to continue to incentivize and retain the Plaintiff each year he was employed by defendant.

16.      At all times relevant hereto, Plaintiff was never informed by his supervisor, Richie, nor anyone at Concentrix, through his performance evaluations or otherwise, that he was deficient in any way in the performance of his duties and responsibilities, or that he needed additional skills to advance his career while employed by Defendant.

17.     When Plaintiff was hired, Defendant represented to him that he would be in charge of the majority of Defendant's HR function for all of Defendant's U.S. based and multi-national locations around the world.

18.     At the time of his hire, Richie informed Plaintiff that Richie did not have a good command of HR issues around the world and would depend on Plaintiff's global HR experience to lead Defendant's global HR team.

19.     After he was hired, Richie further represented to Plaintiff that the reason the HR function reported to Richie was that Defendant's Chief Executive Officer (CEO), Chris Caldwell, did not want another executive reporting directly to him at that time.

20.     Richie also represented to Plaintiff that it was Defendant's plan to have him evolve into the Global CHRO role, responsible for all its HR functions on a global basis after Plaintiff became more familiar with Concentrix, its company culture and when Concentrix grew in size.

21.     Plaintiff was given two major tasks by Richie immediately after he has hired.  First, Plaintiff was tasked with filling a vacancy for the HR regional leadership position in North America; and second, to address performance related issues with the head of HR in the Philippines, both of which Plaintiff addressed successfully within his first 30 days after he was hired.  Plaintiff then continued to forge good and positive relationships with Defendant's other HR and business executives around the globe.

22.     After about a year on the job, Plaintiff again approached Richie about the possibility of evolving into the Global CHRO position, as had originally been discussed with Plaintiff at the time of his initial hire.  Richie again informed Plaintiff that CEO Caldwell still did not want another direct report at that time.   Richie also informed Plaintiff that Plaintiff was performing his job very well.

23.     At this time, Plaintiff asked Richie for a written performance review, an annual, company-wide practice, to which Richie responded that he "generally [was] not good at those things."   Nonetheless, Plaintiff received a 4 out of a 5 rating; a higher than average merit increase; a performance bonus; and stock option grants in his first year of employment with Defendant.

24.     Plaintiff traveled extensively while employed by Defendant in 2017, 2018, and 2019, meeting Defendant's other business executives in their regions throughout the world to create deeper bonds between their business units and HR.

25.     Plaintiff planned and conducted numerous meetings with employees around the world. These meetings had multiple purposes, including assessing current policies; recommending new HR strategies, practices and policies where needed; and leading the required changes to make Human Resources more efficient, responsive and effective.  These meetings were also to reinforce the Concentrix culture among all employees, principally by holding town hall meetings, round tables,  recognition events,  instilling in both HR employees and business leaders the HR culture of results with compassion, and verifying that Defendant's HR teams around the globe were doing what needed to be done to further Defendant's success in business around the world.

26.     At all times, Plaintiff coordinated with Richie and other business executives to implement all HR policies and strategies.

27.     As result of Plaintiff's efforts to establish himself with Defendant, Plaintiff received excellent feedback from Defendant's business leaders and employees and earned the informal title of being "the go to HR guy" throughout Defendant's multi-national locations.[1]

28.     In June 2018, Defendant announced that it would be acquiring Convergys Corporation, based in Cincinnati, Ohio, Convergys had approximately 115,000 employees worldwide which were going to be merged to Concentrix's 110,000 employees worldwide, for a total of 225,000 Concentrix employees.

29.     Immediately after the Convergys merger was announced, Plaintiff asked Richie to lead the employee /HR integration team, being that Richie was already responsible for the HR

---

[1] In fact, CEO Caldwell stated that Plaintiff had been an excellent ambassador of the Concentrix culture when Plaintiff interviewed with Caldwell for the Global CHRO position.

function at Concentrix, and Plaintiff already had deep experience in the field of employee integration with his previous employers.   Richie responded that he felt this was too monumental a task to be added to Plaintiff's responsibilities, or to any one leader for that matter.

30.     Plaintiff then informed Richie that Plaintiff had led several employee integrations teams after mergers and acquisitions with his previous employers.  Plaintiff was then given the responsibility to lead the integration of the acquired employees at Convergys into Concentrix.

31.     Plaintiff performed the integration of Convergys employees into Concentrix so well that he was given an extra bonus in compensation for it in December 2019.  This special bonus was in addition to Plaintiff's annual incentive bonus and stock option grants.

32.     In the third quarter of Fiscal Year 2019, as a result of his continued success while employed by Defendant, Plaintiff was promoted to Global Vice President HR, the only one of the Plaintiff's peer group to be promoted to a "Global Vice President" title.

33.     After Plaintiff was promoted to Global Vice President, HR, Plaintiff met with Richie to inquire again whether he and the position he then held would evolve into the Global CHRO position, as originally had been discussed at the time of Plaintiff's initial hire.

34.     Later in 2019, Plaintiff learned through the Company's internal HR system that a Global CHRO vacancy had been announced within the Senior Executive Team and CEO Caldwell.

35.     Despite Plaintiff discussing this issue with Richie numerous times in the past, Richie did not inform Plaintiff of the Global CHRO vacancy

36.     Plaintiff then inquired from Richie about the Global CHRO vacancy, who confirmed that the vacancy for the Global CHRO had, in fact, been created.

37.     Richie then informed Plaintiff that if he applied for the Global CHRO vacancy, he would "definitely be included" as a candidate but that Defendant would also be seeking external candidates for the vacancy.

38.      Richie also informed Plaintiff that the Global CHRO position would report to Richie and that the CHRO position would be a member of the SET.  Richie further detailed that the Global CHRO position would eventually report to CEO Caldwell, and that CEO Caldwell would be the primary interface with the Global CHRO on priorities and decisions related to HR matters.

39.     The Global CHRO position was classified as a Senior Vice President, which would have been a promotion for Plaintiff.

40.     The Global CHRO position required, among other things, some high-level competencies in a global organization, such as Concentrix.   The vacancy announcement included several key previous experience requirements, such as:

- Major sizeable organizations in employees and revenue experience in high growth companies with organically and inorganically driven strategies. Developed a team driven, transparent, aligned, and clear integration plan with a global and local approach.

- Highly effective executive and employee interface with clients in a global organization.

- Scaled a global decentralized Human Resources organization through the recruitment and development of people.

- Understanding of service driven organizations with fast growth and change, profitability, high revenue, lower margin, and lower profit per employee. Creativity regarding financial and non-financial recognition and motivation highly valued for this role.

- Industry exposure in technology, BPO, value added distribution, call center, logistics, hospitality, financial services, high tech, and professional services industries helpful. Multi location and international accountabilities in all

areas of Human Resources within the Americas, APAC (Asia/Pacific, Japan and EMEA (Europe/Middle East/Africa).

41.     A true and correct copy of the vacancy announcement for the Global CHRO position is attached as **Exhibit 1** and fully incorporated herein by reference.

42.     Plaintiff applied for the Global CHRO position.

43.      Plaintiff met most, if not all the qualifying criteria for the position.

44.     Plaintiff was one of two finalists interviewed for the Global CHRO position.

45.     After his first initial interview for the Global CHRO position, Plaintiff was asked by Richie to present in his stead at Defendant's annual company leadership kick-off meeting in January, 2020, in Amsterdam, the Netherlands because Richie was not able to attend due to conflicting family responsibilities.

46.     Plaintiff then prepared two HR related documents to present at the kick-off leadership meeting general session attended by key company senior executives, and an HR-specific breakout session agenda for HR executives in attendance. Both documents were approved in advance by Richie for Defendant's annual company leadership meeting in Amsterdam, the Netherlands.

47.     Plaintiff's presentation to Defendant's executives attending the annual leadership meeting was very well received and Plaintiff received nothing but excellent feedback about his presentation from those in attendance.  As an example, after the HR presentation, two Concentrix international senior vice presidents pulled Plaintiff aside and stated that "it was the best HR presentation at an annual meeting that they had ever seen, far better than what Richie had presented in previous years."

48.     CEO Caldwell made an appearance at Plaintiff's HR breakout session on the third day of the annual leadership meeting in Amsterdam, during which HR issues and successes were discussed.

49.     During the breakout session, and in response to a comment on diversity, CEO Caldwell explicitly stated that **he would not select a White male for the next SET vacancy**.

50.     The next SET vacancy filled by Defendant was the Global CHRO position to which Plaintiff had applied and for which he had been interviewed.

51.     CEO Caldwell was the final selecting official for the Global CHRO position to which Plaintiff applied.

52.     Plaintiff and several other executives in attendance were taken aback by this patently discriminatory announcement by the CEO.

53.     Several executives in attendance approached Plaintiff after this meeting and informed Plaintiff that they were disappointed by the CEO's discriminatory statement, knowing that Plaintiff had applied for the Global CHRO position, and for which Plaintiff had been interviewed and thought he was being considered.

54.     Plaintiff left this meeting feeling targeted and discriminated, believing that the selection for the CHRO position vacancy had not been announced yet.

55.     In follow up calls, several of the executives who attended Defendant's annual leadership meeting in Amsterdam again confirmed to Plaintiff that CEO Caldwell had, in fact, stated that he was not going to select a White male for the next SET vacancy.[2]

56.     After the meeting in Amsterdam, Plaintiff was invited to a final interview with CEO Caldwell.

---

[2] Plaintiff is reluctant to name these executives at this stage for fear that they will be retaliated against by Defendant.

57.     On February 13, 2020, Plaintiff was informed by Richie that he had not been selected for the Global CHRO position.  On this date, Richie informed Plaintiff that a woman from the Houston area had been selected for the vacancy and that she had an HR background in the healthcare industry.

58.     After Richie informed Plaintiff that he had not been selected, Richie told Plaintiff that "it was also decided that "if she (referring to the person selected for the CHRO job in question) doesn't work out, that he (Plaintiff) would then be offered the position."

59.     After being told on February 13, 2020, that he had not been selected for the Global CHRO position, Richie also informed Plaintiff that he had a lot of supporters in the company and within Defendant's SET.   Richie further stated that neither Richie nor CEO Caldwell wanted Plaintiff to leave or resign, and that to show their support for Plaintiff, Plaintiff would be offered executive coaching, which was available only to the SET and to very select high potential, highly valued executives employed by Defendant, as part of Defendant's investment in senior-level executive development.

60.     A week later, Plaintiff was informed that the person selected for the Global CHRO position was Kim Sullivan (Sullivan), a younger Black female.

61.     At this time, Plaintiff learned that Sullivan was a 45-year-old Black female; had no global experience in any role she previously had; no related Concentrix industry experience; that her previous experience had primarily been in the U.S. health care industry; and that Sullivan's experience was far less than Plaintiff's.

62.     Plaintiff also learned that Sullivan's previous HR positions had extremely short tenures and that Sullivan moved from one job to another often, a fact later confirmed by Richie. (See Exhibit 4).

63.     After Sullivan was hired as the CHRO, Plaintiff no longer reported to Richie; rather, Plaintiff reported to Sullivan, still as the Global Vice President, HR.

64.     During his first meeting with Sullivan, Plaintiff briefed Sullivan about standard procedures in his role as the Global Vice President HR, including the fact that he sometimes texted Richie through "WhatsApp," a social media text messaging application to prioritize issues that needed immediate attention.[3]

65.     In a deliberate attempt to entice Plaintiff to belittle Richie, Sullivan then made an incredulous statement by telling Plaintiff: "so I take it you're not a fan of Steve [Richie]?"

66.     Plaintiff immediately corrected Sullivan to ensure there was no confusion in what he was saying to Sullivan and stated to Sullivan: "no, that's not true."

67.      Plaintiff immediately corrected Sullivan and told her that "WhatsApp" texting was a way that Plaintiff and Richie had agreed would be the best way to alert one another when there was something that needed more urgency than regular email.

68.     During his first meeting with Sullivan, and half way through his briefing to her, Sullivan interrupted and told Plaintiff that she knew that he had competed against her for the Global CHRO job and further told Plaintiff that she would understand if he wanted to find another role in the Company or whether  Plaintiff wanted to  leave Concentrix altogether.

69.     Plaintiff informed Sullivan that it was not his intention to leave Concentrix or the human resources organization and that it was his goal to help her with her new role as the CHRO.

70.     After his first couple of meetings with Sullivan, and after observing several weeks of Sullivan's behavior in the CHRO role, Plaintiff met with Richie on March 27, 2020, and

---

[3] Plaintiff, Richie and other executives employed by Defendant used the WhatsApp messaging media as a method to communicate amongst themselves on matters that needed immediate attention.

expressed to Richie Plaintiff's concerns about Sullivan's professionalism and her lack of credentials for the Global CHRO position.

71.     During this meeting, Plaintiff stated to Richie that he felt that he had been discriminated against by Defendant's selection of a much younger, less qualified Black female for the job.

72.     Plaintiff informed Richie that Sullivan did not meet the qualifications for the Global CHRO, as outlined in the vacancy announcement.

73.     Plaintiff next met with Sullivan on March 30, 2020, a meeting that Sullivan had initiated on a regular basis, and again offered his help to Sullivan in any way that he could to help her acclimate to Concentrix and to help her with HR strategy.  Early in this meeting, Sullivan interrupted Plaintiff and told Plaintiff she did not want or need his help.

74.     Sullivan further stated to Plaintiff that she found him "**fussy, disrespectful, prone to temper tantrums and known for throwing people under the bus to get ahead.**"  Sullivan then told Plaintiff to "ask others at Concentrix what they thought of him and he would find out."

75.     Plaintiff immediately asked for examples of Sullivan's allegations, which Sullivan refused to provide.

76.     Plaintiff then told Sullivan that he was incredibly surprised to be labeled as she alleged.  Plaintiff was shocked that Sullivan had labeled him as "fussy, disrespectful, prone to temper tantrums and known to throw people under the bus."

77.     In an effort to de-escalate the false and acrimonious accusations by Sullivan, Plaintiff apologized to Sullivan for any misinterpretations Sullivan might have had about his character and professionalism and ended the meeting.

78.    Plaintiff was shocked after this meeting with Sullivan.  Plaintiff immediately sent a WhatsApp text message to Richie and asked him if Richie thought he was "fussy, disrespectful, known to throw people under the bus.?"

79.    Richie, too, apparently was incredulous at Sullivan's statement to Plaintiff and replied**: "Wow.  No, I would not say that**."  A true and correct copy of that text message conversation is attached as **Exhibit 2,** and fully incorporated herein by reference.

80.    Richie then told Plaintiff that this was not a conversation for texting and asked Plaintiff to call him.

81.    Plaintiff then again complained to Richie about Sullivan's lack of qualifications and her lack of experience for the role as the Global CHRO, and that Sullivan was retaliating against Plaintiff because of Plaintiff's prior meeting (March 27, 2020) with Richie.

82.     Richie acknowledged to Plaintiff in a WhatsApp text on March 30, 2020 that Richie had indeed discussed some of the concerns raised by the Plaintiff with Sullivan before Sullivan's March 30 meeting with the Plaintiff. A true and correct copy of that text is attached as **Exhibit 2** and incorporated herein by reference.

83.    After this meeting, Plaintiff was ostracized by Sullivan and Plaintiff's role as Global Vice President, HR was significantly diminished.

84.    Soon after Plaintiff complained to Richie about being discriminated against, Sullivan's lack of qualifications, experience and lack of professionalism, Plaintiff was informed by Sullivan on June 5, 2020, that his position was being eliminated.

85.    On that same day, June 5, 2020, Plaintiff was presented a Separation and Waiver and Release Agreement.

86.    The Separation Agreement presented to Plaintiff was not compliant with the Older Workers Benefit Protection Act (OWBPA) in that it failed to list other employees whose jobs were being eliminated by Defendant in the documents presented to Plaintiff, in violation of 29 U.S.C. § 626(f)(H).

87.    A true and correct copy of the Separation Agreement presented to Plaintiff is attached as **Exhibit 3** and fully incorporated herein by reference.

88.    Plaintiff learned that Dan Woods (Woods), another older White male employed by Defendant in the same organizational unit as Plaintiff, was also informed that his job was being eliminated by Sullivan on the same day as Plaintiff's.

89.    Woods also reported to Richie, and subsequently to Sullivan after she was selected as the Global CHRO

90.    Plaintiff discussed the elimination of Woods' job with Woods, who informed Plaintiff that he (Woods) had discussed the elimination of Wood's job with Richie and that he (Woods) felt that he was being replaced by younger non-White persons who Sullivan had waiting in the wings to replace him.

91.    Richie informed Woods that Defendant would not let that happen because Defendant was concerned about Sullivan's frequent job changes.

92.     A true and correct copy of the texts exchanged between Plaintiff and Woods is attached hereto as **Exhibit 4** and fully incorporated herein by reference.

93.    Defendant's non-compliance with OWBPA was a deliberate act to circumvent the ADEA and further evidence of age discrimination.

94.     In spite of Richie's assurances to Woods, in July 2020 Sullivan in fact did hire two younger female non-White Directors into the Concentrix HR department assuming the vast

majority of Woods' previous responsibilities. One is Jiquanda Nelson, Senior Director of Community and Culture at Concentrix. The other is Ly Nguyen, Director Communications, People Solutions at Concentrix. Both of these replacements for Woods were known to and worked with Sullivan at a previous company, Kaiser Permanente in the Seattle, Washington area.

95.     Plaintiff protested to Richie that he felt that his position was being eliminated in retaliation for opposing the selection of Sullivan, who was younger and less qualified than Plaintiff; and that he was being terminated right in the middle of a pandemic.

96.     Plaintiff's last day of employment was July 31, 2020.

97.     Plaintiff was not selected for the Global CHRO because of his race (White) sex (male) and age (61) as evidenced by the CEO's statement that he was not going to select a White male for the next SET vacancy.  This is direct evidence of discrimination, as corroborated by several of the executives in attendance at the meeting in Amsterdam.

98.     Defendant instead selected a much younger Black female with much less qualifications than Plaintiff.

99.      Plaintiff was terminated from his employment in retaliation for his complaint to Richie about Sullivan's lack of qualifications for the Global CHRO position.

100.     At the time of his separation, Plaintiff's annual salary was, $240,137, plus a 40% bonus every year, which he received as a result of his excellent performance every year he was employed by Defendant.

101.     At the time of his unlawful discriminatory and retaliatory discharge, Plaintiff had 1,832 remaining awarded yet unvested shares of restricted Synnex stock.  valued at $124.74 per share upon market closing July 31, 2020, the Plaintiff's termination date, the total value of

Plaintiff's awarded yet unvested stock was $228,523.68, which the Plaintiff lost in its entirety as a result of his termination effective July 31, 2020.

102.    Based on information and belief, the salary paid to Sullivan for the CHRO vacancy which was discriminatorily denied Plaintiff is $350,000 per annum, plus 50% bonus of base compensation and stock awards commensurate with the Concentrix Senior Vice President job level.

## V.  NOTICE OF RIGHT TO SUE

103.    On or about August 2020, Plaintiff filed a charge of discrimination and retaliation with the U.S. Equal Employment Opportunity Commission (EEOC), Charge Number 450-2020-05644, attached hereto as **Exhibit 5**, and incorporated herein by reference.

104.    Plaintiff thereafter requested a Notice of Right to Sue from the EEOC, which was issued by the EEOC on August 21, 2020.  A true and correct copy of the Notice of Right to Sue is attached as **Exhibit 6,** and fully incorporated herein by reference.

105.    This lawsuit has been commenced within 90 days of the receipt of the Notice of Right to Sue from the EEOC.

## VI. CAUSES OF ACTION

### Count 1
### Discrimination under Title VII, Civil Rights Act of 1964, as amended,
### Based on Race (White), Sex (male)

106.    Plaintiff realleges each matter contained in the previous paragraphs of this Complaint and further states and alleges as follows:

107.    Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Defendant's CEO, the selecting official for the CHRO stated that he was not going to select a White male for the next SET vacancy.   Plaintiff was unlawfully subjected to unlawful discrimination by Defendant's selection of younger, less qualified Black female. Plaintiff has

suffered adverse employment actions by Defendants based on his sex (male) and race (White). These employment actions are in violation of Title VII, 42 U.S.C. S 2000e-2(a).

108.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future.

109.    Plaintiff is entitled to the rights and remedies at law provided by Title VII including past and future wages, actual damages, compensatory damages, punitive damages, and attorneys' fees.

## Count 2
## Discrimination under the Age Discrimination in Employment Act (ADEA), as amended

110.    Plaintiff realleges and incorporates all previous paragraphs herein of this Complaint and further states and alleges as follows:

111.    The ADEA makes it unlawful to for employers and their agents "to fail and refuse to hire…. any individual…because of such individual's age."  29 U.S.C. § 623(a)(1).

112.    Plaintiff was 60 years old at the time he applied for the Global CHRO vacancy announced by Defendant and 61 when he was terminated.

113.     Plaintiff was qualified for the Global CHRO vacancy announced by Defendant.

114.    A significantly younger (45 years old), Black female with less qualifications was hired by Defendant.

115.    The Defendant's actions are in violation of the ADEA.

116.    The Defendants actions were knowing, willful, and in reckless disregard for Plaintiff's rights protected under the ADEA, in violation of 29 U.S.C § 626(b). Plaintiff has been made to suffer economic and non-economic damages, including but not limited to mental anguish

and emotional distress, loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of defendants' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by the ADEA, 29 U.S.C. §§ 216(b) and 626(b) including but not limited to lost past and future wages, benefits, bonuses, stock options, actual damages, compensatory damages, liquidated damages, and attorneys' fees.

### Count 3
### Retaliation under Title VII

117.   Plaintiff realleges each matter contained in the previous paragraphs of this Complaint and further states and alleges as follows:

118.   Defendant committed unlawful employment practices when it retaliated against Plaintiff for his efforts to oppose practices reasonably believed to be prohibited by Title VII, in violation of Title VII, 42 U.S.C. S 2000e-3(a).  Specifically, Defendant, through the actions of Caldwell, Richie and Sullivan and others employed by Defendant or as Defendant agents, individually and in concert with each other,  retaliated against Plaintiff by eliminating his position when he opposed Sullivan's selection for the Global CHRO and informing Richie that she had inferior qualifications and did not meet the selection criteria stated in the vacancy announcement.

119.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future.

120.   Plaintiff is entitled to the rights and remedies at law provided by Title VII, § 704(a) including but not limited to lost past and future wages, benefits, bonuses, stock options, actual damages, compensatory damages, liquidated damages, and attorneys' fees.

## Count 4
## Retaliation under the ADEA

121.    Plaintiff realleges each matter contained in the previous paragraphs of this Complaint and further states and alleges as follows:

122.    Defendant, through the actions of Caldwell, Richie and Sullivan and others employed by Defendant or as its agents, individually and in concert with each other, committed unlawful employment practices when it

retaliated against Plaintiff for his efforts to oppose age discrimination prohibited by the ADEA, in violation of the ADEA, 29 U.S.C. S 623(d).

123.    Defendants' violation of the ADEA was knowing, willful and in reckless disregard for Plaintiff's rights protected under the ADEA, for which Plaintiff seeks liquidated damages for each violation in accordance with 29 U.S.C. S 216(b).

124.    Plaintiff has been made to suffer economic and non-economic damages, including, but not limited to, mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of past and future wages benefits, stock option grants, as the direct and proximate result of defendants' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by the ADEA, 29 U.S.C. §§ 216(b) and 626(b).

### VII.  JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues and claims triable by jury.

### VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment in his favor against Defendant as follows:

- Reinstate Plaintiff to the position he would have had but for the discrimination complained of herein.

- Awarding actual and compensatory damages more than $75,000 on counts 1 through 4 of this Complaint.

- Awarding punitive damages as provided by statute on plaintiffs Title VII claims.

- Awarding liquidated damages on plaintiffs ADEA claims.

- Awarding prejudgment interest, costs, disbursements, and attorneys' fees.

- Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which retaliates against employees who complain about or participate in complaints about discrimination.

- Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for employees who exercise their federally protected rights to complain about discrimination and which eradicate the effects of its past unlawful employment practices; and

- Such other and further relief as the Court deems just and proper.

Date: September 1, 2020                         Respectfully submitted,

                                                ORENSTEIN LAW GROUP, P.C.

                                                */s/ Jaime Ramon*
                                                Jaime Ramon, Of Counsel
                                                State Bar No. 01657800
                                                jaime@orenstein-lg.com
                                                Nathan M. Nichols
                                                State Bar No. 24060336
                                                nathan@orenstein-lg.com
                                                1201 Elms St, Suite 4020
                                                Dallas, Texas 75270
                                                (214) 757-9101
                                                (972) 764-8110

                                                ATTORNEYS FOR PLAINTIFF

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 21**